Entered on Docket November 17, 2011

**Below is the Order of the Court.**



_____
**Brian D. Lynch
U.S. Bankruptcy Judge**
(Dated as of Entered on Docket date above)

_____

**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA**

| In re: | Case No. 11-44935 |
|---|---|
| GARY J SIEMERS and DANIELLE M SIEMERS, | **MEMORANDUM DECISION** |
| Debtors. | |

The Debtors' Objection to BECU Claim #13 (2010 Jeep Wrangler) and Debtors' Amended Objection to BECU Claim #13 came before the Court for oral argument on November 9, 2011. *See* Docket Nos. 17 and 25. The Court has considered all documents filed in support of, and in opposition, to the Objection as well as the argument of counsel. The following constitutes the Court's Findings of Fact and Conclusions of Law for purposes of Federal Rule of Bankruptcy Procedure 7052. In brief, the Court concludes that Debtors' objection should be sustained in part and denied in part.

**I. Jurisdiction**

The Court has core jurisdiction over this matter pursuant to 28 U.S.C. §§ 1134, 157(b)(1) and (b)(2)(B), (K) and (O).

**II. Findings of Fact**

The facts relevant to the issues before the Court are not in dispute. Debtors filed their Chapter 13 petition and a proposed plan on June 17, 2011. On August 8, 2011, Boeing Employees' Credit Union (BECU) filed a proof of claim in the amount of $34,989.77, secured by a lien on the Debtors'

1

2010 Jeep Wrangler. The contract for the vehicle was signed on July 22, 2010 (within 910 days of the bankruptcy petition) and reflects the fact that Debtors purchased the vehicle for their personal use.

The total amount financed, including various fees, tax and a service contract, was $38,564.92. The cash sale price of the Wrangler was $30,147.00. As part of the transaction, Debtors traded in their existing vehicle—a 2007 Dodge Ram 2500—on which they were still indebted to Alaska USA Federal Credit Union in the amount of $40,304.42. BECU gave Debtors a $30,000.00 trade-in allowance on the Ram, and Debtors made a $6,200.00 down payment.

The contract sets forth these amounts in two relevant sections of the Retail Installment Sale Contract (Exhibit A to the Objection to Claim). The "Total Downpayment" section of the contract contains the following figures:

> Gross Trade-In Allowance: $30,000.00
> Less Payoff Made by Seller: $40,304.42
> Equals Net Trade In: ($10,304.42)
> + Cash: $6200.00

In addition, the section of the contract titled "Other Charges Including Amounts Paid to Others on Your Behalf" reflects that BECU paid Alaska $4104.42 "for Prior Credit or Lease Balance."

On September 22, 2011 Debtors filed an objection to BECU's claim. *See* Docket No. 17. They argued the total negative net trade-in amount of $10,304.42, the so-called "negative equity," was not part of BECU's purchase money security interest under the holding of *In re Penrod (Penrod II)*, 611 F.3d 1158 (9th Cir. 2010) and subject to bifurcation and cramdown under 11 U.S.C. § 506(a). Debtors argued that because the Wrangler was worth $26,205.00, BECU was entitled only to a secured claim of $26,205.00 at 6.74% interest and to an unsecured claim for the balance of the contract.

BECU argued in response that Debtors' $6,200.00 down payment should be treated as reducing the negative equity of $10,304.42 and objected to any reduction of its secured claim in an amount greater than $4,104.42. BECU agreed that while amounts paid by a purchase money lender to the previous lienholder on a trade-in vehicle are not part of the new lender's purchase money security interest under *Penrod II*, it had only paid Alaska $4,104.42—not $10,304.42. It further noted that,

2

under the plain language of the contract, the $6,200.00 down payment was paid off against the trade-in deficiency and was not part of the cash price of the vehicle.

Debtors filed a Reply and Amended Objection to BECU's claim. They reiterated their position that the $6,200.00 down payment was not paid to Alaska, but was instead applied to the purchase price of the Wrangler. They also purported to amend their objection to BECU's claim, seeking to bifurcate and cramdown BECU's secured claim to $24,685.35 (BECU's $34,989.77 claim less the $10,304.42 in negative equity), "without reference to the current fair market value of this vehicle [the Wrangler]."

### III. Conclusions of Law

The Court concludes that BECU has a secured claim for $30,885.35 and an unsecured claim for the balance of the contract. The $30,885.35 number represents BECU's proof of claim of $34,989.77 less the $4,104.42 BECU paid to Alaska to pay off the Dodge Ram. The contract clearly indicates that the $6,200.00 down payment was applied to reduce the negative equity and was not part of the Wrangler's purchase price. Thus, of the $38,564.92 Debtors financed, only $4,104.42 was used to pay off negative equity and is not part of BECU's purchase money security interest.

"[A] creditor does not have a purchase money security interest in the negative equity of a vehicle traded in during a new vehicle purchase." *Penrod II*, 611 F.3d at 1164 (punctuation omitted). The term "purchase money secured interest" is not defined in the Bankruptcy Code and property interests in bankruptcy are usually controlled by state law. *Id. Penrod II*, in turn, affirmed the Ninth Circuit Bankruptcy Appellate Panel's holding in *In re Penrod (Penrod I)*, 392 B.R. 835, 860 (B.A.P. 9th Cir. 2008) that a purchase money lender has a purchase money security interest "equal to the new value financed." 392 B.R. at 859. In other words, "[a] seller or lender can obtain a purchase money security interest only for new value, and closely related costs. Old value simply does not fit within that rubric." *Penrod II*, 611 F.3d at 1164. Thus, BECU's claim is subject to bifurcation and cramdown under §506(a) to the extent its collateral secures Debtors' negative equity.

The question here is whether Debtors' down payment should be applied to the negative equity or to the price of the Wrangler. Other bankruptcy courts have treated cash down payments as reducing negative equity, provided that such treatment is in fact warranted by the parties' contract. *See, e.g.*, *In re Gray*, 382 B.R. 438, 442 (Bankr. E.D. Tenn. 2008) (noting the "contract computed the negative equity and then applied the rebates and cash down payment to reduce the negative equity"); *In re Burt*, 378 B.R. 352, 355 n. 6 (Bankr. D. Utah 2007) (agreeing with creditor that the debtor's down payment and the manufacturer's rebate were "properly applied to the initial negative equity"). At least one bankruptcy court had held that a cash down payment did not reduce negative equity because the contract did not support such an interpretation. *In re Hayes*, 376 B.R. 655, 659 n. 2 (Bankr. M.D. Tenn. 2007).

On these facts, the Court follows the *Gray* and *Burt* analysis in holding that BECU's contract with Debtors computed the initial negative equity and then applied the cash down payment to reduce the negative equity. The contract indicates that the $6,200.00 down payment was applied against the negative equity of $10,304.42. Furthermore, the contract shows that BECU paid Alaska only $4,104.42. While a creditor does not have a PMSI in the negative equity of a trade-in vehicle, only $4,104.42 of negative equity was financed in this transaction and Debtors are not entitled to cram down BECU's claim by any more than that amount. *Penrod II*, 611 F.3d at 1164.[1]

Debtors' argument that they did not directly pay the $6,200.00 down payment to Alaska misses the point that the contract governs application of the down payment, and the contract manifested their intent to apply the down payment against the negative equity. Their transaction with BECU had the same effect as if they had paid Alaska cash, rather than money borrowed from BECU. *See Gray*, 382 B.R. at 442. "For convenience, the cash was passed through the new car dealer, but the effect was the

---

[1] *Penrod II* was based on California law. Washington's version of U.C.C. § 9-103 is identical to California's. *Compare* RCW 62A.9A-103 *with* Cal. Comm. Code. § 9103. The Ninth Circuit's holding in *Penrod II* is therefore binding on retail installment contracts entered into in Washington State.

4

same." *Id.* Thus, the Court concludes that, of the $38,564.92 financed by the Debtors with BECU, $4,104.02 is attributable to negative equity and is subject to bifurcation and cramdown under § 506(a).

This holding renders Debtors' other argument, to wit, that the secured claim should be reduced by the amount of the negative equity financed by the new lender regardless of the value of the vehicle being purchased, moot. This argument is not in any event supported by *Penrod II* or by the statutes. If a secured claim is not entitled to payment in full under the hanging paragraph, it is nonetheless entitled to secured claim treatment under § 506(a) to the extent of the value of such creditor's interest.

It is so ORDERED.

/// End of Order ///